UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Peter F. Barry, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Texas Market Research Group, L.L.C.,<br><br>Defendant. | Case No. 21-cv-1312 (DWF/KMM)<br><br><br>**AMENDED COMPLAINT**<br>**CLASS ACTION**<br><br><br>**Jury Trial Demanded** |

*Introduction*

1. Plaintiff Peter F. Barry, an individual ("Plaintiff"), individually and on behalf of all others similarly situated, make the following allegations and claims Defendant, upon personal knowledge, investigation of their counsel, and on information and belief.

2. This action seeks redress on a class wide basis for business practices that violate the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA").

3. This Court has jurisdiction to grant the relief sought by Plaintiff pursuant to 47 U.S.C. § 227(b) and 28 U.S.C. § 1331.

4. Venue is proper in this district as a substantial part of the events giving rise to Plaintiff's claims as well as the class wide claims occurred in this District.

*Parties*

5. Plaintiff is, and at all times mentioned herein was, a citizen and resident of the County of Ramsey, State of Minnesota and a "person" as defined by 47 U.S.C. § 153 (39).

6. Plaintiff is the regular and exclusive user of a cellular telephone with service provided by Cricket and registered in his name, namely, (651) 592-8800 ("Cellular Telephone Number").

7. Pursuant to the terms of service, Plaintiff account is charged to his Cellular Telephone Number for each call within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii).

8. Plaintiff received at least one telephone call from Defendant on his Cellular Telephone Number.

9. Defendant Texas Market Research Group, L.L.C., also doing business as Reconnaissance Market Research and/or ReconMR, ("Defendant") is a data collection research firm that is a foreign corporation incorporated in Texas, with an agent of process named Tod C. Higginbotham, located at and doing business from an address of 135 S. Guadalupe, San Marcos, Texas 78666.

10. According to Defendant's website:

> ReconMR is a data collection research firm headquartered in the Austin-San Marcos, TX metropolitan area. ReconMR has experience dating back to the 1960's and has conducted thousands of research projects for a wide range of clients, including state and municipal entities, universities, media outlets, political pollsters, public policy scientists, retail corporations, high tech companies, and more. We're backed by a staff of experienced managers, programmers, and

> supervisors who oversee 1000+ professionally-trained interviewers, including a full complement of bilingual interviewers.
>
> ReconMR's headquarters and one of five call center operations is located 15 minutes South of Austin, Texas and two blocks away from Texas State University, with 35,000+ students currently enrolled. Hispanics comprise 28% of student population and 32% of the Austin-San Marcos metro area population. ReconMR has had a presence in San Marcos since 1999 under its sister company's name, CRI. In 2004, the CRI call center was relocated to an 8,300 sq. ft. purchased facility that currently accommodates administrative offices and 108 call center stations. ReconMR has another 225 [Computer Assisted Telephone Interviewing] stations in Bryan/College Station (home of TX A&M University), another 96 CATI stations in Houston, TX, another 96 CATI stations in San Antonio, TX and yet another in Corpus Christi with 115 stations.

https://www.reconmr.com/about-reconmr/ (last accessed March 22, 2021).

### *Facts*

11. Plaintiff is the regular and exclusive user of a cellular telephone service on the Cellular Telephone Number which he first obtained on or around 2001.

12. On Wednesday, October 2, 2019, Plaintiff received the call from Defendant on his Cellular Telephone Number (hereinafter referred to as the "Call") at approximately 8:24 p.m CT.

13. At the time of the Call Plaintiff had three young children attending elementary school.

14. At the exact time of the Call Plaintiff was at home enjoying time with his family and helping his young children get in bed and prepared for school the next day. The Call Plaintiff received from Defendant interrupted him from these activities.

15. The caller ID on Plaintiff's cell phone identified the Defendant's caller number as 1 (612) 540-1508 which is from a Minnesota area code.

16. Notably, Defendant's system displayed a local Minnesota area code of (612) which did not accurately represent the origination of the Call.

17. The area code misled Plaintiff to believe that he was being called by a local person or business.

18. When Plaintiff first answered the Call, there was a click, a pause and silence initially on the line indicating that the Call was placed using an automated telephone dialing system.

19. Plaintiff immediately felt extremely annoyed, frustrated, angry, and irritated upon receiving and discovering a noticeably (based on the click, pause, and silence) automated call, at a time that was very inconvenient.

20. After a live person employed by Defendant finally got onto the Call with Plaintiff, she thereafter identified herself as "Sanaa" and indicated that the call was being recorded.

21. Sanaa did not greet Plaintiff by his name, nor did she state that she was attempting to contact Plaintiff in particular.

22. Sanaa stated that she was conducting a survey on behalf of the Minnesota Department of Health.

23. During the course of the 54-minute Call, Sanaa explained to Plaintiff that his Cellular Telephone Number had been randomly selected by Defendant to receive this Call made on behalf of the University of Minnesota and the State of Minnesota

        as part of an insurance access survey done in conjunction with the Minnesota Department of Health.

24. At no time did Plaintiff provide his Cellular Telephone Number to Defendant, through any medium or at any time, nor did Plaintiff ever consent to the receipt of automated calls to his Cellular Telephone Number because Plaintiff despises robocalls like the one he received from Defendant.

25. Plaintiff, like most consumers, hates robocalls and finds them invasive, intrusive and aggravating especially at 8:24 p.m. CT when he was interrupted in the privacy of his own home from enjoying time with his family and helping his young children before bedtime.

26. When Plaintiff asked Sanaa how it was that she had dialed his Cellular Telephone Number, she explained that she did not know what telephone number was called by her computer and that she simply received the call on her system after it had connected her to Plaintiff.

27. The TCPA defines an "automatic telephone dialing **system**" as equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers. 47 U.S.C. 227(a)(1). (Emphasis added).

28. Recently the United States Supreme Court clarified the definition of an ATDS, holding, "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021).

29. "System", as defined by the Merriam-Webster Dictionary is "a regularly interacting or interdependent group of items forming a unified whole such as: a group of devices or artificial objects or an organization forming a network especially for distributing something or serving a common purpose." Examples include, "a telephone system, a heating system, a highway system, a computer system".

    See https://www.merriam-webster.com/dictionary/system (last accessed Aug. 10, 2021)

30. The Call that Plaintiff received from Defendant was placed using an automatic telephone dialing system ("ATDS") as defined by 47 U.S.C. § 227(a)(1). See *Facebook, Inc. v. Duguid,* 141 S. Ct. 1163 (2021).

31. Plaintiff is informed and believes Defendant's Automated Telephone Dialing System includes a random number generator which has the capacity to store or produce telephone numbers to be called.

32. Defendant's ATDS employed the use of its random number generator in placing calls to Plaintiff's cellular telephone as well as the other members of the class.

33. One of the methods Defendant's ATDS used to generate random telephone numbers is through a process called "random digit dialing".

34. Plaintiff is informed and believes that Defendant's Automated Telephone Dialing **System** generated Plaintiff's cellular telephone number through the process of "random digit dialing" and subsequently placed the Call to Plaintiff's cellular telephone.

35. Defendant's ATDS dialed Plaintiff's cellular telephone number through the use of "random digit dialing" as well as the other survey called numbers.

36. During the Call, Plaintiff was provided with contact information for a contact person at the University of Minnesota who was overseeing the "Minnesota Health Access Survey" for which Defendant was making automated calls.

37. According to an October 4, 2019, email later received from this contact person, "The MN Health Access Survey **sample is based on a random digit dial data base that includes landlines and cellphone numbers**." (Bold underline added.)

38. Random digit dialing is a common practice used in the survey industry whereby telephone numbers are generated at random for the purpose of identifying and targeting a random selection of individuals for participation in statistical surveys.

39. According to the Geopoll website, "Random digit dialing or RDD is a type of probability sampling in which phone numbers are randomly generated using a software system and used to create the sample for a research project." https://www.geopoll.com/blog/what-is-random-digit-dialing/ (last accessed March 22, 2021).

40. According to the federal government, "Random digit dialing (RDD) generates a pure random sample and provides the advantage of including unlisted phone numbers, as well as numbers which are too new to be listed." https://www.science.gov/topicpages/r/random+telephone+survey.html (last accessed March 22, 2021.)

41. According to the Minnesota Department of Health's website:

> Minnesotans from more than 11,000 households will participate in the study. **<u>Since 2009, the survey has included both cellular and landline phones in the sample.</u>** Beginning in 2019, households are also being contacted by mail.
>
> The size of the survey has varied over time. It includes responses from between 9,700 and 27,000 households between 2001 and 2017. Since 2009, the survey has targeted around 11,000 total respondents, with 12,436 responding in 2017.

https://www.health.state.mn.us/data/economics/hasurvey/index.html (last accessed March 22, 2021) (bold underline added).

42. Upon information and belief, Defendant placed tens of thousands of calls into the State of Minnesota for the purpose of conducting the survey. Defendant's calls caused thousands of Minnesotans' cellular telephones to ring numerous times, interrupting their right to privacy, and their enjoyment of whatever activities they were performing at the time including, spending time with family, working, relaxing, and all the other events – far too many to list—that take place in life.

43. As part of Defendant's survey and strategy, Defendant took the affirmative step of causing local Minnesota area codes to display on the survey call recipient's caller ID. Defendant affirmatively chose not to use their area code or the area code associated with the location where the calls were generated and/or placed. Defendant's call to Plaintiff interrupted Plaintiff's enjoyment of his person life and time, wasted his time, and caused the battery to drain on his phone.

44. Defendant's call to Plaintiff and calls to the survey members interrupted the enjoyment of their lives, their time, and caused the batteries to drain on their cellular telephones.

45. Accordingly, Defendant's affirmative steps of targeting and calling thousands upon thousands of Minnesotans, displaying local Minnesota area codes on the calls, wasting and/or interrupting the lives of thousands of Minnesotans, draining the batteries of cellular telephones belonging to Minnesotans demonstrates how Defendant purposely availed themselves of Minnesota as a forum.

46. Another component of Defendant's Automated Telephone Dialing System that they used to place the Call to Plaintiff and class members is VOXCO.

47. This component of Defendant's ATDS called VOXCO was used by Defendant to call Plaintiff and had a random digit dialer with the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.

48. Defendant did not have Plaintiff's express consent to call his cell phone using an ATDS.

49. Defendant, employing the use of their ATDS, randomly generated dial-able cellular telephone numbers for people within Minnesota using a practice known as Random Digit Dialing and then used its ATDS to call them, including Plaintiff's cellular telephone number.

50. The randomly generated telephone numbers were intentionally randomly generated by Defendant to create dial-able telephone numbers within the various Minnesota area codes.

51. Defendant randomly generated telephone numbers and called all sorts of Minnesota residents who had cellular telephones with Minnesota area codes in order to accomplish a Random Survey of Minnesotans, in an effort to see which had

insurance/did not have insurance/and what their experiences were with insurance/lack of insurance were in Minnesota.

52. Defendant's business model is to conduct random surveys using randomly generated telephone numbers that its ATDS system generates which are thereafter automatically dialed for those telephone numbers that it has randomly generated.

53. By virtue of the randomized survey study methodology employed by the Minnesota Healthcare Survey, Defendant does not have any idea of the actual identity of the person(s) for whose cellular telephone number it has randomly generated and then automatically dialed, including the automated call it made in order to reach Plaintiff.

54. Plaintiff had absolutely no prior personal or professional relationship with Defendant and Plaintiff did not maintain any account or other business relationship with it.

55. Plaintiff never provided his cellular telephone number to Defendant.

56. Defendant, through the use of their ATDS randomly generated Plaintiff's cellular telephone number and then automatically dialed it.

57. Defendant's regular business practices include making repeated telephone calls to persons using an ATDS that employs random digit dialing technology.

58. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing and debt collection practices. The TCPA regulates, *inter alia*, the use of automated dialing systems. Specifically, section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless

number in the absence of an emergency or the prior express consent of the called party. The TCPA's definition of an automatic telephone dialing system includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-9 (7th Cir. 2012).

59. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014 (2003).

60. The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *FCC Declaratory Ruling*, 23 F.C.C.R. at 564-65 (¶10).

61. Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendant to demonstrate that Plaintiff gave his express consent to Defendant to use an autodialer to call his wireless cellular telephone within the meaning of the statute. *See FCC Declaratory Ruling*, 23 F.C.C.R. at 565 (¶ 10).

62. Plaintiff never listed his Cellular Telephone Number in or on any documents during any transaction with Defendant, nor did he subsequently give his express consent to receive calls on his Cellular Telephone Number.

63. By calling Plaintiff on his Cellular Telephone Number using an ATDS and without his consent, Defendant violated 47 U.S.C. § 227(b).

### *Class Action Allegations*

64. Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and on behalf of all others similarly situated.

65. The proposed Class that Plaintiff seeks to represent is defined as follows:

> All persons who had or have a number assigned to a cellular telephone service, which number was called by Defendant using an automatic telephone dialing system and/or an artificial or prerecorded voice in the four years prior to filing of this action. Excluded from the class are persons who Defendant called for emergency purposes and persons who voluntarily provided their cellular telephone numbers to Defendant.

66. Collectively, these persons will be referred to as "Class members." Plaintiff represents and is a member of the Class. Excluded from the Class are Defendant and any entities in which Defendant, or its subsidiaries or affiliates, have a controlling interest, Defendant's agents and employees, the judicial officer to whom this action is assigned and any member of the court staff and immediate family. Also excluded are claims for personal injury, wrongful death, and emotional distress.

67. Plaintiff does not know the exact number of members in the Class, but based upon Defendant's public statements regarding its business in the United States and

investigation of their counsel, Plaintiff reasonably believes that Class members number in the thousands, if not more.

68. There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including, whether Defendant made any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system and/or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service in violation of the TCPA.

69. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff does not have any interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

70. Plaintiff will fairly and adequately protect the interests of the Class and has retained attorneys experienced in class and complex litigation.

71. A class action is superior to all other available methods for the fair and efficient adjudication of the controversy for the following reasons:

   a. It is economically impractical for members of the Class to prosecute individual actions;

   b. The Class is readily definable; and

   c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

72. A class action will cause an orderly and expeditious administration of the claims of the Class. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

73. Class wide relief is essential to compel Defendant to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the statutory damages in an individual action for violation of the TCPA are small. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize calls to their cellular telephones.

74. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with the respect to the Class as a whole appropriate. Moreover, the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

### *First Claim for Relief*

75. Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

76. The foregoing act and omissions of Defendant constitutes numerous and multiple violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

77. As a result of Defendant's negligent violations of the TCPA, Plaintiff and Class members are entitled to an award of $500 in statutory damages for each and every call placed in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

78. Plaintiff and all Class members are also entitled to and do seek injunctive relief prohibiting such negligent conduct that violates the TCPA by each Defendant in the future.

## Second Claim for Relief

79. Plaintiff re-alleges and incorporates by reference the above paragraphs as though set forth fully herein.

80. The foregoing acts and omissions of Defendant constitutes numerous and multiple knowing or willful, or both, violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227.

81. As a result of Defendant's knowing and willful violations of the TCPA, Plaintiff and each member of the Class are entitled to treble damages of up to $1,500 for each and every call made in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

82. Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting such willful conduct that violates the TCPA by Defendant in the future.

## Jury Trial Demand

83. Plaintiff demands a jury trial on each of the causes of action set forth above, including the amount of statutory damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that judgment be entered against Defendant for the following:

84.   An injunction against further violations;

85.   Damages pursuant to 47 U.S.C. § 227(b)(3) on a class-wide basis;

86.   Costs of litigation and reasonable attorneys' fees both as part of a common fund, if any, and pursuant to statute; and

87.   Such other and further relief as the Court may deem just and proper.

Dated this 10th day of August, 2021.

Respectfully submitted,

By:  s/Thomas J. Lyons, Jr.

Thomas J. Lyons, Jr., Esq.
Minnesota Bar No. 0249646
CONSUMER JUSTICE CENTER, P.A.
367 Commerce Court
Vadnais Heights, MN 55127
(651) 770-9707 phone
(651) 704-0907 fax
tommy@consumerjusticecenter.com

Roberto Robledo, Esq.
California Bar No. 260041
(*Admitted Pro Hac Vice*)
Law Office of Roberto Robledo
8033 Linda Vista Road, Suite 200
San Diego, CA 92111
(619) 500-6683 phone
(619) 810-2980 fax

roberto@robertorobledo.com

*ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS*